IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RICKY LEE MEYER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:06CV0114 HEA (AGF) |
| | ) | |
| DON ROPER, | ) | |
| | ) | |
| Respondent. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the petition of Missouri state prisoner Ricky Lee Meyer for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. Petitioner pleaded guilty to one count of child abuse and was sentenced to life imprisonment. The case involved the death of the eight-year old son of Petitioner's girlfriend. For habeas relief, Petitioner claims that (1) his plea was not intelligent and knowing due to his counsel's ineffective assistance in misinforming him about the sentence he would receive; (2) his plea counsel was ineffective in failing to secure the testimony of character witnesses at sentencing; and (3) Petitioner's due process rights were violated due to the prosecutor being related (by marriage) to the victim. For the reasons set forth below, the Court recommends that federal habeas relief be denied.

# BACKGROUND

## Charges and Plea Hearing

Petitioner was charged by information dated October 18, 2001, with second-degree murder (Count I) and one count of the class A felony of abuse of a child (Count II). The information also stated that Plaintiff was a prior and persistent offender. The information stated that on July 30, 2001, Petitioner caused the death of Ryan Beers by grabbing, shaking, and violently throwing him to the floor. (Resp. Ex. B at 17.) On November 5, 2002, Petitioner pleaded guilty to Count II. Under Missouri law, the authorized term of imprisonment for a class A felony is not less than ten years and not more than 30 years, or life imprisonment. Mo. Rev. Stat. § 558.011.1(1).

At the plea hearing, the prosecutor noted that while the State was not actively dismissing the murder charge, that charge would go away as a matter of law by Petitioner pleading guilty to the abuse charge. Petitioner testified that on the day in question he got angry at the victim, and "kept sitting him down," and that he understood from doctors' reports that "that is what hurt him, I sat him down too hard." The prosecutor stated that the State was recommending 30 years imprisonment, and confirmed that Petitioner was not pleading guilty based on this recommendation, but was entering an "open" plea, with the understanding that the court had "the full range of punishment available to [it] at sentencing." (Resp. Ex. B at 31-34.)

Petitioner represented that no one had threatened him or promised him anything to induce him to plead guilty. The court ascertained that Petitioner understood the rights he was giving up by pleading guilty, and that he understood that if he were convicted by a jury,

the jury would be able to recommend a term of imprisonment from ten to 30 years, or life, and that the court could decrease the recommended sentence but not increase it. Petitioner acknowledged that he had had ample time to talk to his counsel about the case, that counsel did everything he had asked him to do and nothing he had asked him not to do, and that Petitioner was "completely satisfied" with counsel's performance. The court accepted the plea to the child abuse charge as voluntary and knowing. Id. at 35-38.

**Sentencing Hearing**

At the sentencing hearing held on December 6, 2002, the victim's grandmother and father testified that the victim had had limited abilities and special needs and had been a happy and loved child. The victim's mother, who had married Petitioner earlier in 2002, testified on his behalf that he would not have done anything to hurt the victim. The prosecutor stated that the crime was more heinous than indicated by Petitioner's statement at the plea hearing that he sat the victim down too hard -- in fact, he lifted the boy over his head and slammed him to the floor. The prosecutor asked the court to impose a sentence of 30 years' imprisonment or life. After Petitioner briefly described his remorse, the court sentenced Petitioner to life imprisonment. Id. at 43-53.

The Court then examined Petitioner as to his satisfaction with his attorney's services. Petitioner represented that he had had sufficient opportunity to discuss his case with his attorney before entering his guilty plea, that counsel had done all that Petitioner had asked him to do and did not communicate any promises to Petitioner to induce him to plead guilty. Petitioner confirmed that counsel did not suggest that Petitioner give false answers to any of the questions asked by the court at the time of the guilty plea. Petitioner stated that he was

satisfied with his counsel's services, and the court found that there was no probable cause to believe that Petitioner had received ineffective assistance of counsel. Id. at 53-56.

**State Post-Conviction Motion**

On January 27, 2003, Petitioner filed a pro se motion to vacate, set aside, or correct his sentence, and on May 1, 2003, appointed post-conviction counsel filed an amended motion. Petitioner raised the claims that he advances in the present habeas action. He claimed that his plea counsel was ineffective and Petitioner's plea was unknowing and unintelligent due to counsel telling him that if he pleaded guilty, he would receive a sentence of no more than 15 years. Petitioner also claimed that plea counsel was ineffective for failing to secure character witnesses at sentencing. Petitioner alleged that he gave counsel a list of witnesses Petitioner wished to be contacted. According to Petitioner, counsel told him to contact these people directly and that counsel would get the sentencing moved to December 12, 2002. Petitioner maintained that he told nine named character witnesses, including Lawrence Woodson, to come to court on December 12, but counsel did not get the date changed and Petitioner was taken to the sentencing hearing on December 6. Petitioner argued that in deciding to plead guilty, he had relied on counsel's assurances that character witnesses would be called at sentencing, and further that there was a reasonable probability that had the character witnesses testified at sentencing, Petitioner would have received a more favorable sentence instead of the maximum. Id. at 76-79.

Petitioner's last claim for post-conviction relief was that his due process rights were violated because the prosecutor was related by marriage to the victim, and to Petitioner at the time of the plea, with the prosecutor's husband and the victim's mother being first

cousins. Petitioner asserted that this created a conflict of interest on the prosecutor's part, and may have resulted in him being treated unfairly with regard to the nature of the charges, the plea bargain offered, or the sentence recommended by the State. Id. at 79-82.

**Post-Conviction Hearing**

An evidentiary hearing was held on December 12, 2003, before the same court that accepted Petitioner's plea and sentenced him. Petitioner's plea counsel testified that he had about 20 years experience in handling criminal cases when he was hired to represent Petitioner, before Petitioner was arrested. Counsel stated that in exchange for Petitioner's plea to the abuse charge, the State agreed to drop the murder charge and the references that Petitioner was a prior and persistent offender. Counsel testified that he explained to Petitioner several times that if he pleaded guilty, it would be an open plea, pursuant to which his sentence could be from ten years to life imprisonment, and that Petitioner should expect near the upper end of that range. Counsel stated that nevertheless Petitioner and his family were "fixated" on the idea that Petitioner would get a sentence of 15 years' imprisonment as had another defendant in a recent shaken-baby death case. (Resp. Ex. A at 4-8.)

Counsel testified that he discussed with Petitioner two potential conflicts of interest with regard to the prosecutor -- her familial relationship to the victim and the fact that in the past she had worked as co-counsel on some civil cases with counsel's then law partner -- but that he advised Petitioner that the prosecuting attorney was new, with Petitioner's case being her first major felony case, and that should Petitioner try to remove her from the case, a more experienced prosecutor would likely be assigned, to Petitioner's disadvantage. Id. at 8-9.

With regard to his investigation of the case, counsel stated that he consulted with several doctors who all felt that it was highly unlikely that the victim's injuries resulted from an accident. Counsel also hired an investigator with whom he examined the victim's room (a day or two before Petitioner pleaded guilty) and found that the particle board under the mattress of a bed was broken. Counsel told Petitioner that this was consistent with Petitioner's version of events (that the victim was injured when he jumped from a dresser onto the bed), and would help his case should he decide to go to trial. Counsel testified that he advised Petitioner that the decision of whether to go to trial or plead guilty was Petitioner's. According to counsel, counsel had been paid $20,000 at that point for representing Petitioner and knew that there would be no more money forthcoming if Petitioner went to trial, but he told Petitioner that if Petitioner wanted to try the case, counsel would do so and that the lack of funds should not impede Petitioner's decision. Counsel testified that had Petitioner decided to go to trial, counsel would have been willing to represent him without any additional payment. Id. at 8-14.

When asked whether Petitioner had provided him with the names of any witnesses Petitioner wished to have called at his sentencing, counsel responded, "No, sir." Counsel continued that at some point, either on the day of the plea or the day of sentencing, he discussed with Petitioner whether it would be a good idea to have Petitioner's mother, wife (the victim's mother), or Woodson testify on Petitioner's behalf at sentencing as character witnesses. Counsel testified that he advised Petitioner that counsel did not think calling Woodson, who had a criminal record, would be a good idea, and that in general, calling character witnesses at sentencing would open the door for the prosecution to introduce

6

evidence of other violent episodes in Petitioner's past. Counsel testified that after he told this to Petitioner, Petitioner did not direct him to call any character witnesses. Id. at 14-15.

Counsel again testified that he knew at the time he was representing Petitioner that the prosecutor was somehow related to Petitioner and the victim, and that he still advised Petitioner that, in light of the prosecutor's inexperience with felony cases, it would be unwise to try to remove her. Counsel acknowledged that he might have told Petitioner that it would be political suicide for the new prosecutor to agree to a 15-year sentence for Petitioner, advice counsel stated he believed was sound. According to counsel, the first time that Petitioner indicated that he wanted to plead guilty was within a week of the trial date and it was at that point that a plea agreement was discussed with the prosecutor. Counsel recalled that he discussed the potential conflicts on the record with the court and waived them. He further stated that he and Petitioner discussed the prosecutor's relationship to the victim and "We decided not to raise it as an issue." Id. at 16-20.

Petitioner's mother testified at the post-conviction hearing that at a meeting with herself, Petitioner, the victim's mother, and trial counsel, which took place a day or two before Petitioner pleaded guilty, counsel stated that if Petitioner pleaded guilty, he would get a sentence of 15 years' imprisonment. She also testified that prior to that time, counsel understood that he would not get any more money beyond the $20,000 he had already been paid, even if the case went to trial. Id. at 23-27.

Three of the people named in the post-conviction motion as potential character witnesses, including Woodson, testified that they knew Petitioner since the early 1990's, used to see him several times a week, sometimes with Petitioner's children present, and

7

never saw him hit any of his children. Two of these witnesses were asked whether they would have been willing to testify on Petitioner's behalf at the sentencing hearing and each responded that he would have but was never asked to do so. Id. at 28-44.

Petitioner's wife also testified at the post-conviction hearing. She recounted that at the meeting with her, Petitioner, his mother, and Petitioner's counsel, counsel stated that if Petitioner pleaded guilty, Petitioner would serve up to 15 years. She understood this to mean that Petitioner would get a longer sentence, but would serve 15 years. On cross examination, Petitioner's wife stated that counsel explained (at the meeting) that the judge could sentence Petitioner for up to 30 years or life in prison. Id. at 46-48.

Petitioner was the last witness to testify at the post-conviction hearing. He stated that at the meeting referenced by his mother and wife, counsel stated that he had just talked to the prosecutor who had talked to the judge and that if Petitioner pleaded guilty, he would get a sentence of 15 years or less. Petitioner testified that right after sentencing, counsel told Petitioner that this agreement was not put in writing because it would have been political suicide for the prosecutor to do so. Petitioner stated that had he gone to trial, his defense would have been that the victim had injured himself by jumping from a dresser onto his bed. The hole found in the bed board would have helped his case, but because counsel did not investigate the scene until the week Petitioner was to go to trial, the value of this evidence was diminished. Petitioner testified that he did not believe that he had caused the victim's death and that his statement at the plea hearing on the cause of death was made at the prompting of his attorney. Petitioner did not go to trial because counsel told him that if he

went to trial, the prosecutor would seek life imprisonment, but if he pleaded guilty to the abuse charge, he would get 15 years or less. Id. at 50-56.

Petitioner next testified that he gave counsel a list of names of about 15 people to call as character witnesses at sentencing. Counsel told him that he would call all the witnesses and this was something Petitioner relied on in deciding to plead guilty, although the real deciding factor was counsel's assurance that if Petitioner pleaded guilty, his sentence would be 15 years or less. Petitioner also testified that he disagreed with counsel's advice not to seek to remove the prosecutor because she was related to the victim, but counsel still did not seek to remove her. Id. at 56-59.

On cross-examination, Petitioner testified that when the court told him at the plea hearing what the range of punishment was, he asked his counsel about it, but his counsel punched him in the elbow and said, "Don't worry. It's taken care of. Go through the motions. You'll get what you're going to get." Petitioner acknowledged that counsel told him that Petitioner's older children had by deposition implicated Petitioner in the victim's death. Id. at 60.

**State Courts' Post-Conviction Decisions**

The motion court denied Petitioner's motion for postconviction relief in its entirety. The court first found that the testimony of Petitioner and his mother that counsel told them Petitioner would get a 15-year sentence if he pleaded guilty to the abuse charge was not credible, and that Petitioner's open plea of guilty was not based upon any incorrect advice of counsel. The post-conviction court also found that Petitioner's testimony that he provided his counsel with names of witnesses to testify at sentencing was inconsistent with

9

Petitioner's statements at sentencing and was not credible, and that thus Petitioner had failed to show that he received ineffective assistance of counsel on this matter. The court also noted that the testimony of Petitioner's three friends at the sentencing hearing "simply mirrored that of his mother and his wife" that Petitioner was good with his children and never violent with them. Id. at 91-95.

With regard to petitioner's last claim, the court stated that there was no showing of any prejudice toward Petitioner as a result of the prosecutor's relationship to the victim, and further that there was evidence presented at the post-conviction hearing, as well as on the record prior to the plea, that Petitioner waived any conflict-of-interest of the prosecutor prior to entering his plea of guilty.[1] Id. at 95.

The Missouri Court of Appeals affirmed the denial of post-conviction relief, concluding that the motion court's findings and conclusions were not erroneous. On Petitioner's first claim, the appellate court deferred to the motion court's credibility determinations, discrediting Petitioner's and his mother's testimony and crediting Petitioner's wife's testimony on the matter. The appellate court also relied upon the facts that at the plea hearing, the court indicated to Petitioner the range of punishment he faced, and that Petitioner said that he understood this, and also that no promises had been made to him to induce him to plead guilty. (Resp. Ex. F at 3-5).

With regard to counsel's failure to secure the testimony of character witnesses at sentencing, the state court of appeals concluded that "in one respect or another," Petitioner

---

[1] The record before the Court does not contain any transcript, other than that of the post-conviction hearing, reflecting what occurred prior to the plea with regard to such waiver.

10

failed to establish ineffective assistance of counsel. The court stated that as to six of the potential witnesses named by Petitioner (the named individual witnesses other than Woodson and the three friends who testified at the post-conviction hearing), Petitioner failed to demonstrate that counsel knew of their existence, that they would have testified, what their testimony would have been, and how their testimony would have changed the outcome of his case. As to Woodson, the court stated that counsel chose not to call him as a matter of reasonable trial strategy. Moreover, the appellate court deferred to the trial court's discrediting Plaintiff's testimony that he gave counsel a list of names of witnesses Petitioner wanted to be called at sentencing. The appellate court cited Petitioner's testimony following sentencing that confirmed that counsel had done all that Petitioner had asked him to do. Id. at 5-9.

The appellate court also found no error in the motion court's rejection of Petitioner's last claim. The appellate court stated that Petitioner provided no evidence that the prosecutor's relationship to the victim was of any significance in her handling of the case, that she failed to conduct herself in a fair manner, or that he was adversely affected by the alleged conflict of interest. The court also pointed to plea counsel's testimony that he had discussed the relationship with Petitioner and they decided not to raise it as an issue. Id. at 9-11.

# DISCUSSION

**Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus cannot be granted unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). "AEDPA effected a move toward greater deference in the § 2254 courts' review of state-court decisions." Brown v. Leubbers, 371 F.3d 458, 460 (8th Cir. 2004) (en banc).

The "contrary to" clause is satisfied if a state court has arrived "'at a conclusion opposite to that reached by [the Supreme Court] on a question of law'" or "'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent'" but arrives at the opposite result. Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)). A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413; Linehan v. Milczark, 315 F.3d 920, 924 (8th Cir. 2003).

A case cannot be overturned merely because it incorrectly applies federal law; the application must also be "unreasonable." Williams, 529 U.S. at 411; Colvin v. Taylor, 324

F.3d 583, 587 (8th Cir. 2003) (under AEDPA, a writ of habeas corpus may not be granted "unless the relevant state court decision is both wrong and unreasonable").

> The factual findings of the state court also may be challenged in a § 2254 petition, but they are subject to an even more deferential review. Relief may be granted if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only by "clear and convincing evidence." Id. § 2254(e)(1).

Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001).

**Ineffective Assistance of Counsel / Involuntary Plea**

Two constitutional rights are involved in Petitioner's first claim -- the right to the effective assistance of counsel and the right to a trial. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must not only show that counsel's performance was deficient, but that he was prejudiced by his counsel's incompetence. Strickland v. Washington, 466 U.S. 668, 694 (1984). In order to show prejudice, a habeas petitioner who pled guilty in state court must show that "there is a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985) (applying Strickland to the guilty plea context).

A guilty plea, which waives a criminal defendant's right to a trial, "not only must be voluntary," but must be a knowing, intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970); see also North Carolina v. Alford, 400 U.S. 25, 31 (1970) (guilty plea that is not "voluntary and knowing" violates due process).

13

Here, the motion court, which was also the trial court, was in the best position to assess the credibility of the witnesses at the post-conviction hearing. That court did not believe Petitioner and his mother that Petitioner's counsel told Petitioner that he would receive a 15-years sentence, and the state appellate court deferred to this credibility determination. In this context, "[i]ssues of credibility are left to the discretion of the state courts." Winfield v. Roper, 460 F.3d 1026, 1035 (8th Cir. 2006). "Federal habeas review gives federal courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial [post-conviction] court, but not by them." Perry v. Kemna, 356 F.3d 880, 885 (8th Cir. 2004) (citation omitted).

The state courts also relied upon the plea proceedings to reject Petitioner's related claims that counsel was ineffective and that his guilty plea was not knowing and intelligent. As noted above, at the plea hearing, the court informed Petitioner that he could receive a sentence of life imprisonment for the child abuse charge. Petitioner acknowledged that he understood this. In addition, Petitioner stated at the plea hearing that he had no complaints about counsel's performance. The state courts determined that this exchange precluded a claim that Petitioner was prejudiced by counsel allegedly misadvising him that he would get a sentence of not more than 15 years, and this Court concludes that this was not an unreasonable application of Hill or based upon an unreasonable determination of the facts. See Nelson v. Hvass, 392 F.3d at 320, 323-24 (8th Cir. 2004) (holding that where habeas petitioner was informed at guilty plea hearing as to what his sentencing exposure was, the state courts' finding that he did not base his decision to plead guilty on his attorney's alleged misstatements on the likely sentencing consequences if he pleaded guilty instead of going to trial was not an

14

unreasonable determination of the facts); Wilcox v. Hopkins, 249 F.3d 720, 724-75 (8th Cir. 2001) (rejecting claim of ineffective assistance based upon counsel's alleged misinformation as to likely sentencing consequences of pleading guilty where the state court advised petitioner of applicable minimum and maximum sentence); Dunn v. Wyrick, 679 F.2d 731, 732-33 (8th Cir. 1982) (rejecting habeas petitioner's claim that plea counsel was ineffective for, among other things, misleading petitioner into believing he would receive a certain sentence, in light of petitioner's testimony at plea hearing that he was satisfied with counsel's performance).

Petitioner's assertion that counsel prompted him to testify at the plea hearing that he understood the range of punishment does not avail Petitioner. See Smith v. Lockhart, 921 F.2d 154, 157 (8th Cir. 1990) (per curiam) (rejecting habeas petitioner's claim that his guilty plea was involuntary due to counsel's ineffective performance in preparing the case, where at plea hearing petitioner testified that his plea was voluntary; "Solemn declarations in open court carry a strong presumption of verity."); Hardene v. Nixon, No. 4:07CV1062 JCH, 2008 WL 508676, at *5 (E.D. Mo. Feb. 21, 2008) (deferring to state court's rejection of habeas petitioner's claim that plea counsel was ineffective for allowing him to plead guilty when he was taking pain medication, where petitioner stated at the plea hearing that he was fully alert and plea counsel testified to same at post-conviction hearing). Accordingly, this ground for habeas relief should be denied.

**Failure to Secure Testimony of Certain Character Witnesses**

Petitioner's second claim was also reasonably adjudicated by the state courts. In general, defense counsel has an obligation to investigate adequately whether there were witnesses willing to testify on his client's behalf at sentencing. Amrine v. Bowersox, 238 F.3d

1023, 1031 (8th Cir. 2001). Here, as noted above, after Petitioner was sentenced, he indicated to the sentencing court that counsel had done all that Petitioner had asked him to do, and that Petitioner was satisfied with counsel's services. The state courts reasonably concluded that this defeated Petitioner's claim that counsel was ineffective in failing to call as character witnesses individuals whose names Petitioner allegedly provided, or in acting in a manner that frustrated Petitioner's attempts to secure the testimony of these witnesses.

Although the record establishes that Petitioner did give counsel Woodson's name as a character witness, this does not undermine the validity of the state courts' rejection of the claim under consideration, based upon Petitioner's representations at sentencing, as explained above.

**Prosecutor's Relationship with the Victim (and to Petitioner)**

Plaintiff's last claim for federal habeas relief is that his due process rights were violated due to a conflict of interest on the part of the prosecutor created by the fact that the prosecutor was related to the victim. The Court finds this claim to be without merit, even if due process requires a disinterested prosecutor in a criminal case, cf. Young v. U.S. ex rel Vuitton et Fils SA, 481U.S.787, 807 (1987) (plurality opinion) (holding that the appointment of a party's lawyer to prosecute a criminal contempt action against an opponent was a structural error; utilizing the Court's supervisory authority to reverse the convictions, thus avoiding constitutional issue), and even if the prosecutor here was not "disinterested" as that term is used in Young. Petitioner's plea counsel testified at the post-conviction hearing that he discussed the matter with Petitioner and that they made the strategic decision not to raise the prosecutor's potential conflict as an issue. The state courts impliedly credited this testimony,

16

and upon review of the record, this Court concludes that the state courts were entitled to do so. Based upon this testimony, the state courts' rejection of Petitioner's claim did not result in an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (explaining that "'clearly established Federal law' in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of [the Supreme Court]'s decisions as of the time of the relevant state-court decision'") (quoting Williams, 529 U.S. at 412). This Court concludes that just as a criminal defendant may waive many constitutional rights, such as the right to a jury trial, he may waive the right to a prosecutor who is not related to the victim of the crime (or to the defendant himself).

The state courts also found that Petitioner was not prejudiced by the prosecutor's relation to the victim, and this finding is also entitled to deference. There is no indication in the record that this was an unreasonable finding, or that the prosecutor's familiar relationship to the victim (first cousin once removed, by marriage) biased her handling of Petitioner's case or prejudiced Petitioner in any way. See Webber v. Scott, 390 F.3d 1169, 1176 (10th Cir. 2004) (distinguishing Young, and holding that a federal due process habeas claim that the prosecutor was not disinterested is subject to harmless error review). Thus, although the record before the court does not contain a waiver on the record of any conflict of interest, Petitioner's claim on the matter was reasonably rejected by the state courts, precluding habeas relief on the claim.

## CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. Furthermore, the Court does not believe that reasonable jurists might find the Court's

17

assessment of Petitioner's claims for habeas relief debatable or wrong, for purposes of issuing a Certificate of Appealability under 28 U.S.C. §2254(d)(2).  See <u>Miller-El v. Cockrell</u>, 123 S.Ct. 1029, 1040 (2003) (standard for issuing a Certificate of Appealability) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)).

Accordingly,

**IT IS HEREBY RECOMMENDED** that the petition of Ricky Lee Meyer for a writ of habeas corpus relief be **DENIED**.

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability not be issued in this case.

The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that the failure to file timely objections may result in a waiver of the right to appeal questions of fact.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of January, 2009.